EXHIBIT "A"

# OPERATING AGREEMENT

## OF

## 901 NEW HAMPSHIRE, LLC

THIS OPERATING AGREEMENT ("Agreement") is made and entered into as of the 5th day of November, 2012, by and among 901 New Hampshire, LLC a Kansas limited liability company (the "Company"), and the persons executing this Agreement as "Members" (as set forth on **Schedule A** attached hereto).

WHEREAS, on **30th day of May**, 2012, the Company was formed by the filing of Articles of Organization with the Kansas Secretary of State under the Kansas Revised Limited Liability Company Act (the "Act").

NOW, THEREFORE, the Members (defined below) hereby adopt this Agreement as the "operating agreement" of the Company under the Act to set forth the rules, regulations and provisions regarding the management and business of the Company, the governance of the Company, the conduct of its business, and the rights and privileges of its Members, and in consideration of the premises and the mutual agreements contained herein, the parties hereto agree as follows:

## ARTICLE I
## BUSINESS PURPOSES AND OFFICES

1.1  **Business Purpose.** The business purpose of the Company shall be to own and operate a restaurant, or such other business activities as deemed legal by the State of Kansas. The Company shall be an association among the Members only for such specifically authorized business purpose and shall not be deemed to create any association among the Members with respect to any other activities whatsoever other than the activities within such business purpose.

1.2  **Principal Office.** The principal business office of the Company shall be located at, Lawrence, Kansas 66044, or at such other place(s) as a Majority in Interest (defined below) may determine from time to time.

1.3  **Registered Office and Resident Agent.** The location of the registered office and the name of the resident agent of the Company in the State of Kansas shall be David M. Lewis, 901 New Hampshire, Suite 102, Lawrence, Kansas 66044, as stated in the Articles (defined below), or as shall be determined from time to time by a Majority in Interest and appropriately filed with the Kansas Secretary of State as required by the Act.

## ARTICLE II
## DEFINITIONS

2.1 **Terms Defined Herein.** As used herein, the following terms shall have the following meanings, unless the context otherwise specifies:

"**Act**" means the Kansas Revised Limited Liability Company Act, as amended from time to time.

"**Agreement**" means this Operating Agreement of the Company, as amended from time to time.

"**Articles**" means the Articles of Organization of the Company filed with the Kansas Secretary of State, as amended from time to time.

"**Available Cash**" means the aggregate amount of cash on hand or in bank, money market or similar accounts of the Company at any given time derived from any source (other than Capital Contributions and liquidation transactions) which a Supermajority in Interest determines is available for distribution to the Members in accordance with the Act.

"**Bankruptcy**," with respect to any Person, means the entry of an order for relief against such Person under the United States Bankruptcy Code, the insolvency of such Person under any state insolvency act or any other event of "bankruptcy" with respect to such Person as described in the Act.

"**Business**" means to own and operate a restaurant, or such other business activities as deemed legal by the State of Kansas in accordance with this Agreement.

"**Capital Account**" means the separate bookkeeping account established and maintained for each Member by the Company pursuant to Section 3.3.

"**Capital Contribution**," with respect to a Member, means the total amount of cash and the net Fair Value of property contributed by such Member (or his predecessor in interest) to the capital of the Company.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of future laws.

"**Company**" means 901 New Hampshire, LLC, a Kansas limited liability company.

"**Credits**" means all investment and other tax credits allowed by the Code with respect to activities of the Company or the Property.

"**Distributions**" means any distributions by the Company to the Members of Available Cash or Liquidation Proceeds.

"**Fair Value**" of an asset or property means its fair market value.

Case 14-21645    Doc# 29-1    Filed 10/06/14    Page 2 of 19

Rate."

"**Property**" means all properties and assets that the Company may own or otherwise have an interest in (to the extent of such interest) from time to time.

"**Reserves**" means amounts set aside from time to time by a Supermajority in Interest pursuant to Section 4.5.

"**Substitute Member**" has the meaning set forth in Section 9.3 below.

"**Supermajority in Interest**" means any Member or group of Members holding an aggregate of 75% or more of the Percentage Interests held by all Members. Whenever this Agreement provides that a Supermajority in Interest is to be determined by excluding a Member(s) or is to be determined out of only certain Members, then a Supermajority in Interest means any Member or group of Members holding an aggregate of 75% or more of the Percentage Interests held by all of the non-excluded Members.

"**Transfer**" means (i) when used as a verb, to give, sell, exchange, assign, transfer, pledge, hypothecate, bequeath, devise or otherwise dispose of or encumber, and (ii) when used as a noun, the nouns corresponding to such verbs, in either case voluntarily or involuntarily, by operation of law or otherwise, including, without limitation, upon Bankruptcy, death, divorce, marriage dissolution or otherwise.

"**Treasury Regulations**" means the regulations promulgated by the Treasury Department with respect to the Code, as such regulations are amended from time to time, or corresponding provisions of future regulations.

2.2 **Other Definitional Provisions.**

(a) As used in this Agreement, accounting terms not defined in this Agreement, and accounting terms partly defined to the extent not defined, shall have the respective meanings given to them under generally accepted accounting principles.

(b) The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.

(c) Words of the masculine gender shall be deemed to include the feminine or neuter genders, and vice versa, where applicable. Words of the singular number shall be deemed to include the plural number, and vice versa, where applicable.

# ARTICLE III
# CAPITAL CONTRIBUTIONS AND LOANS

3.1 **Initial Capital Contributions**. The Members have made or will make promptly the initial Capital Contributions to the Company as set forth on **Schedule A**.

3.2 **Additional Capital Contributions; Defaulting Members.**

(a) The Members recognize that the Company may require capital from time to time, in addition to that contributed pursuant to Section 3.1, in order to accomplish the purpose and business for which it is formed. The Members as a group shall be required to make one or more additional Capital Contributions to the Company from time to time in an aggregate cumulative amount determined by a Supermajority in Interest in good faith that such additional capital contributions are necessary for the Company. Upon any such determination, a Supermajority in Interest shall, by written notice, call for any such additional contributions to be made by the Members to the capital of the Company. Within 20 days following the issuance of such a capital call, each Member shall contribute, in cash, to the capital of the Company an amount (the "Additional Contribution") equal to such Member's Percentage Interest multiplied by the aggregate additional Capital Contribution to be made by all Members.

(b) If any Member fails or refuses for any reason to make in a timely manner any part or all of an Additional Contribution (the "Unpaid Additional Contribution"), such Member shall be in default hereunder and shall be deemed to be a "Defaulting Member" and the Unpaid Additional Contribution shall constitute an obligation of such Defaulting Member to the Company and shall bear interest from the date of such Defaulting Member's default at a floating annual rate of interest equal to the lesser of (A) three percent (3%) (300 basis points) over the Prime Rate in effect from time to time, or (B) the maximum rate permitted by law. Interest shall be compounded monthly and be payable on demand. The Company may, upon the decision of a Majority in Interest (determined by excluding the Defaulting Member), institute suit in any court of competent jurisdiction to enforce such obligation of the Defaulting Member. In addition, the Company shall be entitled to recover in such suit all costs and expenses, including, but not limited to, court costs and reasonable attorneys' fees, thereby incurred by the Company and any damages (except incidental or consequential damages) sustained by the Company as a result of the default by the Defaulting Member.

(c) So long as a Member remains a Defaulting Member, such Member shall have no voting rights with respect to decisions of the Company and only the votes of the non-Defaulting Members shall be taken into account for all such purposes. The Defaulting Members and their Percentage Interests shall be

disregarded completely for all purposes of determining whether the requisite votes have been obtained from a Majority in Interest, Supermajority in Interest, or all of the Members, as the case may be, and such requisite votes shall only be required out of the non-Defaulting Members.

3.3     **Capital Accounts.** A separate Capital Account shall be maintained for each Member in accordance with the Code and the Treasury Regulations.

3.4     **Capital Withdrawal Rights, Interest and Priority.** Except as otherwise expressly provided in this Agreement, (i) no Member shall be entitled to withdraw, receive any return of or reduce such Member's Capital Contribution or Capital Account or to receive any distributions from the Company, (ii) no Member shall be entitled to demand or receive property other than cash in return for its Capital Contribution or as part of any Distribution, (iii) no Member shall be entitled to receive or be credited with any interest on any Capital Contribution or the balance in such Member's Capital Account at any time, and (iv) no Member shall have any priority over any other Member as to the return of the Capital Contribution of such Member or the balance in such Member's Capital Account.

3.5     **Loans From Members.** Any Member may make (but shall not be obligated to make) a loan to the Company in such amounts, at such times and on such terms and conditions as may be approved in good faith by a Majority in Interest. Loans by any Member to the Company shall not be considered as contributions to the capital of the Company.

3.6     **No Personal Liability.** Except as otherwise expressly provided in this Agreement, no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of loans shall be made solely from the Company's assets. The Members shall not be personally liable for the payment or performance of the debts and other obligations of the Company.

3.7     **No Liability for Restoration of Negative Capital Account.** Notwithstanding anything in this Agreement to the contrary, no Member shall have an obligation to contribute additional capital to the Company to restore a negative Capital Account balance to zero.

# ARTICLE IV
# ALLOCATIONS AND DISTRIBUTIONS

4.1     **Non-Liquidation Cash Distributions.** The amount, if any, of Available Cash shall be determined by a Supermajority in Interest from time to time, but no less frequently than annually and shall be distributed to the Members in accordance with their respective Percentage Interests. The members agree that no less than one hundred percent (100%) of the Company's surplus cash at year-end, after payment of all expenses, short term debt and the creation of necessary reserves approved by a Supermajority in Interest, shall be distributed to Members, unless a Supermajority in Interest determines otherwise. For the purpose of this formula, short term means debts coming due within the next 90 days.

4.2     **Liquidation Distributions.** Liquidation Proceeds shall be distributed in the following order of priority:

(a)     To the payment of debts and liabilities of the Company (including to Members to the extent otherwise permitted by law) and the expenses of liquidation; then

(b)     To the setting up of such reserves as the Person required or authorized by law to wind up the Company's affairs may reasonably deem necessary or appropriate for any disputed, contingent or unforeseen liabilities or obligations of the Company; then

(c)     The remainder to the Members in accordance with and to the extent of their respective positive Capital Account balances after taking into account the allocation of all Income or Loss pursuant to this Agreement for the taxable year(s) in which the Company is liquidated.

4.3     **Allocation of Income, Loss and Credits.**

(a)     Income or Loss (other than Income or Loss from liquidation transactions) and Credits (as those capitalized terms are defined in the Tax Exhibit) for each taxable year shall be allocated among the Members in accordance with their respective Percentage Interests. To the extent there is a change in the respective Percentage Interests of the Members during the year, Income, Loss and Credits shall be allocated among the pre-adjustment and post-adjustment periods as provided in the Code and the Treasury Regulations.

(b)     Income from liquidation transactions shall be allocated among the Members in the following order of priority:

(1)     To those Members, if any, with negative Capital Account balances (determined prior to taking into account any distributions pursuant to Section 4.2) in the ratio that such negative balances bear to each other until all such Members' Capital Account balances equal zero; then

(2)     The remainder to the Members in accordance with their respective Percentage Interests.

(c)     Loss from liquidation transactions shall be allocated among the Members in the following order of priority:

(1)     To those Members, if any, with positive Capital Account balances (determined prior to taking into account any

distributions pursuant to Section 4.2) in the ratio that such positive balances bear to each other until all such Members' Capital Account balances equal zero; then

(2) The remainder to the Members in accordance with their respective Percentage Interests.

4.4 **No Priority**. Except as may be otherwise expressly provided in this Agreement, no Member shall have priority over any other Member as to Company income, gain, loss, credits and deductions or distributions.

4.5 **Reserves**. A Majority in Interest shall have the right to establish, maintain and expend reasonable Reserves to provide for working capital, for debt service, for expected operating deficits, for facility expansions or replacements, and for such other purposes as a Majority in Interest may deem necessary or advisable.

### ARTICLE V
### MEMBERS' MEETINGS

5.1 **Meetings of Members; Place of Meetings**. An annual meeting of the Members shall be held on the second Monday in January of each year or on such other date as a Supermajority of the Members shall determine. Regular monthly, quarterly or other periodic meetings may be held upon the determination of a Supermajority in Interest to hold such meetings. Special meetings may be called at any time by any Member. Meetings (whether annual, regular or special meetings) of the Members may be held for any purpose or purposes, unless otherwise prohibited by statute. All meetings of the Members shall be held at such place within Douglas County, Kansas as shall be stated in the notice of the meeting or at any other location agreed upon by all of the Members.

5.2 **Quorum; Voting Requirement**. The presence, in person or by valid proxy, of a Supermajority in Interest shall constitute a quorum for the transaction of business by the Members. The affirmative vote of a Majority in Interest shall constitute a valid decision of the Members, except where a Supermajority in Interest or unanimous vote is required by the Act, the Articles or this Agreement.

5.3 **Proxies**. At any meeting of the Members, every Member having the right to vote shall be entitled to vote in person or by proxy appointed by an instrument in writing signed by such Member and bearing a date not more than one year prior to such meeting.

5.4 **Notice**. Written notice stating the place, day and hour of each meeting and, in the case of a special meeting, the purpose for which the meeting is called shall be delivered not less than ten days nor more than 60 days before the date of the meeting, either personally or by mail or by electronic mail, by or at the direction of the person calling the meeting, to each Member entitled to vote at such meeting. Notice to Members, if mailed, shall be deemed delivered as to

any Member when deposited in the United States mail, addressed to the Member at its usual place of business or last known address, with postage prepaid and notice to Members, if delivered by electronic mail, shall be deemed delivered as to any Member when said electronic mail is sent by such electronic means to the Member at its last known electronic address on file with LLC.

5.5     **Waiver of Notice.** When any notice is required to be given to any Member, a waiver thereof in writing signed by the Member, whether before, at, or after the time stated therein, or any attendance of the Member at the meeting (other than at the beginning of the meeting to object to the holding of the meeting), shall be equivalent to the giving of such notice.

5.6     **Action Without Meeting.** The Members agree that a meeting of the Members shall not be required for the Members to make any decision or to take any action to be made or taken by the Members by a Majority in Interest, Supermajority in Interest or unanimously. Any decision or action required or permitted to be taken by the Members may be taken without a meeting if the action is evidenced by one or more written consents or documents constituting or describing the action to be taken, signed by a Member or Members having the requisite aggregate Percentage Interests.

## ARTICLE VI
## MANAGEMENT

6.1     **Management by Members.** The management of the Company shall be vested in the Members. Each Member shall be an agent of the Company for the purpose of the Business and its affairs, but the authority of each Member to act for the Company shall be limited by and is subject to the requirements of the Act or this Agreement that certain decisions and acts of the Members and the Company be made or taken by a Majority in Interest, a Supermajority in Interest or unanimously by all Members. Only the decisions or acts of a Member within the scope of its authority granted hereunder shall control and shall bind the Company.

6.2     **Authority of a Majority in Interest.** In addition to the rights and authority given to a Majority in Interest elsewhere in this Agreement, but subject to the limitations set forth in Sections 6.3 and 6.4 or elsewhere in this Agreement, a Majority in Interest shall have the right, power and authority from time to time to make such decisions and take such actions for and on behalf of the Company as such Majority in Interest deems necessary or appropriate to operate the Business and, not in limitation of the foregoing, to make the following decisions and take the following actions on behalf of the Company, all subject to any limitations set forth in this Agreement or in the Act:

(a)     Selection (including changes) of and contracting with the Company's legal, accounting, tax and other professional advisors, provided that such selection is at arm's length and at no greater than market rates, and that any advisors, accountants, lawyers that do work for any members of the Company or any members' other businesses must be approved by a Supermajority in Interest.

(b)     Acquisition of insurance coverage for the protection or

benefit of the Company or the Property;

(c) Temporary investment of funds of the Company in short term investments, e.g. money market accounts or other similar "no risk" investments where there is appropriate safety of principal; and provided that such investments are with institutional investors with a solid credit rating and reputation.

(d) ; To: carry out the decisions of the Members made pursuant to this Agreement;

(e) Negotiation and execution of all documents and agreements, and the exercise of all rights and remedies, of the Company in connection with the foregoing.

6.3 **Limitations on Authority.**

(a) Whenever the consent or approval of the Members is required in this Agreement for any transaction or act of the Company, such consent or approval shall be required of Members holding the applicable aggregate Percentage Interests as stated in this Agreement and there shall be no requirement that the majority of the Members, by number, approve or consent to any transaction or act. For purposes of this Agreement, actions and/or transactions "in the ordinary course or usual way of business or affairs" shall include, but not be limited to, the exercise by a Majority in Interest of its authority as specified in Section 6.2, except as expressly prohibited or limited by Section6.3(b) or (c) or elsewhere in this Agreement, and the Members hereby approve of such actions and/or transactions and agree that they may be taken by a Majority in Interest without obtaining any further approval of the Members. No Member shall have the right to delegate to any Person the Member's rights or powers to manage or control the business and affairs of the Company, except as approved by a Majority in Interest.

(b) The Company, through a Member, a Majority in Interest or otherwise, shall not do any of the following without the prior written consent of a Supermajority in Interest:

(1) Take any action required by any provision of this Agreement or by law to be approved or authorized by a Supermajority in Interest.

(2) Make any loans or advances to or investments in any other Person, other than the extension of payment terms in the ordinary course of business or as permitted under Section 6.2(d).

(3) Guarantee or assume any liability or obligation of any other Person.

(4) Acquire any Interest by redemption or otherwise (with the Supermajority in Interest for consent purposes being determined by excluding the Member whose Interest is being acquired).

(5) Purchase, lease or otherwise acquire, or sell, lease or otherwise dispose of, (A) any personal property with a cost or Fair Value, whichever is greater (or aggregate cost or Fair Value in case of related items or transactions) in excess of $1,000.00, or (B) any real property.

(6) Any borrowing of funds in excess of $1,000.00 or the granting of any mortgage, deed of trust, security interest or similar lien on any Property.

(7) File for Bankruptcy.

(8) Hire or fire any employee of the Company.

(9_ Any modifications of this Operating Agreement

(10) To: (1) bring or defend, pay, collect, compromise, arbitrate, resort to legal action or otherwise adjust claims or demands of or against the Company; (2) make or revoke any election available to the Company under any tax law; (3) enforce the Company's rights and perform its obligations under all agreements to which the Company is a party; (4) prepare, execute, and file any documents required to be filed with any government authority; and (5) expend Company funds necessary or appropriate to effect any of the foregoing; and

(c) The Company, through a Member, a Majority in Interest, a Supermajority in Interest or otherwise, shall not take any action required by any provision of this Agreement or by law to be approved or authorized by all of the Members unless such action has been so approved or authorized by all of the Members.

### 6.4 Compensation; Reimbursements.

(a) Except as provided in subsection (b) and (c) below or as approved by a Supermajority in Interest in good faith, no Member or affiliate of a Member shall be entitled to compensation for any services the Member may render to or for the Company. Except as otherwise expressly provided in this Agreement, each Member shall be entitled to reimbursement from the Company for all reasonable direct out-of-pocket third party expenses incurred on behalf of the Company as contemplated in this Agreement.

(b) The provisions of this Section shall not prohibit the Company from entering into an agreement with a Member or an officer, director, employee, owner or other affiliate of a Member for such Person to render specific services to the Company and to receive reasonable compensation for such specific services as approved in good faith by a Supermajority in Interest.

(c) Sula Teller Hogue and David M. Lewis shall be employees of the Company and each shall receive salaries approved by a Supermajority in Interest.

# ARTICLE VII
# LIABILITY AND INDEMNIFICATION

7.1     **Limitation of Liability.** To the extent permitted by law, a Member shall not be liable for damages or otherwise to the Company or any Member for any act, omission or error in judgment performed, omitted or made by it or them in good faith and in a manner reasonably believed by it or them to be within the scope of authority granted to it or them by this Agreement and in the best interests of the Company, provided that such act, omission or error in judgment does not constitute bad faith, fraud, gross negligence, willful misconduct or breach of fiduciary duty.

7.2     **Indemnification.** The Company shall indemnify each Member to the fullest extent permitted by the Act, but such indemnity shall not extend to any conduct by the party seeking indemnification that is determined by a court of competent jurisdiction to constitute bad faith, fraud, gross negligence, willful misconduct or breach of fiduciary duty. Any indemnity under this Section 7.2 shall be paid from, and only to the extent of, Company assets and no Member shall have any personal liability on account thereof.

# ARTICLE VIII
# ACCOUNTING AND BANK ACCOUNTS

8.1     **Fiscal Year and Accounting Method.** The fiscal year and taxable year of the Company shall be the fiscal and taxable year, January 1 to December 31. The Company shall use the cash method of accounting for revenue and expenses.

8.2     **Books and Records.** The books and records of the Company shall be maintained at the principal office of the Company. Each Member (or such Member's designated agent or representative) shall have the right during ordinary business hours and upon reasonable notice to inspect and copy (at such Member's own expense) all books and records of the Company (other than those containing trade secrets or similar confidential information) for any purpose reasonably related to the Member's Interest.

8.3     **Taxation as Partnership.** The Company shall be treated as an "S Corporation" or "partnership" for Federal and state income tax purposes. All provisions of this Agreement and the Articles shall be construed and applied so as to preserve that tax status.

8.4     **Tax Returns and Elections; Tax Matters Partner.**

(a)     The Company shall cause to be prepared and timely filed all federal, state and local income tax returns or other returns or statements required by applicable law. The Company shall claim all deductions and make such elections for federal or state income tax purposes which a Majority in Interest reasonably believes will produce the most favorable tax results for the Members.

(b)     **David M. Lewis** is hereby designated as, and hereby accepts the position of, the Company's "Tax Matters Partner," as defined in the Code. In such capacity, the Tax Matters Partner is hereby authorized and empowered to act for and represent the Company and each of the Members before the Internal Revenue Service in any audit or examination of any Company tax return and before any court selected by the Tax Matters Partner for judicial review of any adjustment assessed by the Service. Each of the Members consents to and agrees to become bound by all actions of the Tax Matters Partner, including any contest, settlement or other action or position which the Tax Matters Partner may deem proper under the circumstances.

8.5     **Bank Accounts.** All funds of the Company shall be deposited in a separate bank, money market or similar account(s) approved by a Majority in Interest and in the Company's name. Withdrawals (by check or otherwise) there from shall be made only by the signature of persons authorized to do so by a Majority in Interest. The designated banking institution upon formation of this LLC is designated as **US Bank, Lawrence, KS.** Designated banking institution may be changed upon approval by a Majority in Interest.

8.6     Credit Card. The Company shall have use of a credit card provided by Sula Teller Hogue ("Cardholder") for use in Company business under the following terms of agreement: (i) that all credit card expenditures are approved by a Supermajority in Interest; (ii) the company assumes responsibility for all debt and the payment of amounts charged on the card: (iii) the Company indemnifies Cardholder for any and all claims made against Cardholder for Company's failure to promptly pay the amounts due on the card and for any negative impact such failure has on Cardholder's credit rating; and (iv) in the event of liquidation of Company pursuant to Article IV, payment of Cardholder's credit card shall have priority in the payment of Company debt.

### ARTICLE IX
### TRANSFERS OF INTERESTS

9.1     **General Restrictions.** No Member may Transfer all or any part of such Member's Interest (including any Distribution rights associated with such Interest), except (i) as otherwise expressly permitted in this Agreement, or (ii) with the unanimous written consent of *all* Members. Any purported Transfer of all or any part of an Interest in violation of the terms of this Agreement shall be null and void and of no effect. A permitted Transfer shall be effective as of the date specified in the instruments relating thereto. Any assignee desiring to make a further Transfer shall be subject to all of the provisions of this Article IX to the same extent and in the same manner as any other Member desiring to make any Transfer.

9.2     **Permitted Economic Transfers.** Each Member shall have the right to Transfer all or part of the Distribution rights or other economic interests (but not to substitute the assignee as a Substitute Member in his place, except in accordance with Section9.3 below), by a written instrument, provided that:

(a) the Transfer would not result in the "termination" of the Company pursuant to Section 708 of the Code;

(b) a Majority in Interest (determined by excluding the Member making the Transfer) has consented in writing to such Transfer and assignee;

(c) no permitted Transfer to a minor or incompetent shall be made other than in trust for the benefit of such person or in custodianship under the Uniform Transfers to Minors Act or similar legislation; and

(d) the assignee agrees in writing that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement.

9.3 **Substitute Members.** No assignee of all or part of a Member's Interest shall become a Substitute Member in place of the assignor unless and until:

(a) The Transfer complies with the provisions of Section 9.2.

(b) The assignor Member (if living) has stated such intention in the instrument of assignment;

(c) The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member;

(d) The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a Substitute Member; and

(e) All of the other Members have consented in writing to such assignee becoming a Substitute Member, which consent may be withheld for any or no reason.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Members shall cause this Agreement (including **Schedule A**) to be duly amended to reflect the admission of the assignee as a Substitute Member.

9.4 **Effect of Admission as a Substitute Member.** Unless and until admitted as a Substitute Member pursuant to Section 9.3, a permitted assignee of all or a part of a Member's Interest shall not be entitled to exercise any of the governance or other rights or powers of a Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Interest transferred to him, the Distributions to which the assignor would be entitled. A permitted assignee who has become a Substitute Member has, to the extent of the Interest transferred to him, all the rights and powers of the Person for whom he is

Page 14 of 19

Case 14-21645    Doc# 29-1    Filed 10/06/14    Page 13 of 19

substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act. Upon admission of a permitted assignee as a Substitute Member, the assignor of the Interest so acquired by the Substitute Member shall cease to be a Member of the Company to the extent of such Interest. A Person shall not cease to be a Member upon assignment of all of such Member's Interest unless and until the assignee(s) becomes a Substitute Member.

9.5 **Additional Members.** Additional Members (as distinguished from Substitute Members) may be admitted to the Company only by the unanimous agreement of the Members.

9.6 **Withdrawal, Retirement or Resignation of a Member.** No Member shall have the right or power, and no Member shall attempt, to withdraw, resign or retire from the Company. Any act or purported act of a Member in violation of this Section shall be null and void and of no effect.

## ARTICLE X
## DISSOLUTION AND TERMINATION

10.1 **Events Causing Dissolution.** The Company shall be dissolved upon the first to occur of the following events:

(a) The expiration of the period (if any) fixed for the duration of the Company, as set forth in the Articles, unless extended by the unanimous written consent of the Members.

(b) The written agreement of a Supermajority in Interest to dissolve.

(c) Any other event causing a dissolution of the Company under the provisions of the Act, except that (i) a vote of the Members to dissolve shall cause a dissolution only if it satisfies clause (b) above or the next sentence, and (ii) the death, withdrawal, retirement, resignation, Bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member or an event of withdrawal of a Member shall not cause the Company to be dissolved or its affairs to be wound up. Upon the occurrence of any such event, the Company shall be continued without dissolution, unless within 90 days following the occurrence of such event, the other Members excluding the affected Member unanimously agree in writing to dissolve the Company. If the Company is not so dissolved, the business of the Company shall continue (A) with the affected Member, if living, remaining as a Member, or (B) if such Interest is transferred to a successor holder by operation of law, with such assignee being a permitted assignee of the Distribution rights associated with such Interest, but such assignee shall become a Substitute Member only in accordance with Section 9.3 above.

10.2 **Effect of Dissolution.** Except as otherwise provided in this Agreement, upon the dissolution of the Company, the Members shall take such actions as may be required pursuant to the Act and shall proceed to wind up, liquidate and terminate the business and affairs of the Company. In connection with such winding up, a Majority in Interest shall have the authority to

liquidate and reduce to cash (to the extent necessary or appropriate) the assets of the Company as promptly as is consistent with obtaining a fair and reasonable value therefor, to apply and distribute the proceeds of such liquidation and any remaining assets in accordance with the provisions of Section 10.3 below, and to do any and all acts and things authorized by, and in accordance with, the Act and other applicable laws for the purpose of winding up and liquidation.

10.3 **Application of Proceeds.** Upon dissolution and liquidation of the Company, the assets of the Company shall be applied and distributed in the order of priority set forth in Section 4.2.

## ARTICLE XI
## MISCELLANEOUS

11.1 **Title to Assets.** Title to the Property and all other assets acquired by the Company shall be held in the name of the Company. No Member shall individually have any ownership interest or rights in the Property or any other assets of the Company, except indirectly by virtue of such Member's ownership of an Interest. No Member shall have any right to seek or obtain a partition of the Property or other assets of the Company, nor shall any Member have the right to any specific assets of the Company upon the dissolution of the Company.

11.2 **Nature of Interest in the Company.** A Member's Interest shall be personal property for all purposes.

11.3 **Notices.** Except for the notices required by Section 5.4 which shall be governed by that section, any notice, demand, request, call, offer or other communication required or permitted to be given by this Agreement or by the Act shall be sufficient if in writing and if hand delivered or sent by mail to the address of the Member as it appears on the records of the Company. All mailed notices shall be deemed to be given when deposited in the United States mail, postage prepaid.

11.4 **Waiver of Default.** No consent or waiver, express or implied, by the Company or a Member with respect to any breach or default by another Member hereunder shall be deemed or construed to be a consent or waiver with respect to any other breach or default by such Member of the same provision or any other provision of this Agreement. Failure on the part of the Company or a Member to complain of any act or failure to act of another Member or to declare such other Member in default shall not be deemed or constitute a waiver by the Company or the Member of any rights hereunder.

11.5 **No Third Party Rights.** None of the provisions contained in this Agreement shall be for the benefit of or enforceable by any third parties.

11.6 **Set-Off.** Without limiting any other right the Company may have, the Company, in its sole discretion, may set off against any amounts due a Member from the Company any and

all liquidated amounts then or thereafter owed to the Company by the Member in any capacity, whether or not such amount or the obligations to pay such amount owed by the Member is then due.

### 11.7 Entire Agreement; Amendment.

(a) This Agreement (together with the Articles) contains the entire agreement between the Members, in such capacity, relative to the formation, operation and continuation of the Company.

(b) Except as otherwise expressly provided elsewhere in this Agreement, this Agreement shall not be altered, modified or changed except by a written document duly executed by all Members at the time of such alteration, modification or change.

### 11.8 Severability.
In the event any provision of this Agreement is held to be illegal, invalid or unenforceable to any extent, the legality, validity and enforceability of the remainder of this Agreement shall not be affected thereby and shall remain in full force and effect and shall be enforced to the greatest extent permitted by law.

### 11.9 Binding Agreement.
Subject to the restrictions on the disposition of Interests herein contained, the provisions of this Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, personal representatives, successors and permitted assigns.

### 11.10 Headings.
The headings of the articles and sections of this Agreement are for convenience only and shall not be considered in construing or interpreting any of the terms or provisions hereof.

### 11.11 Counterparts.
This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one agreement that is binding upon all of the parties hereto, notwithstanding that all parties are not signatories to the same counterpart. This Agreement may be delivered by facsimile transmission. This Agreement shall be considered to have been executed by a person if there exists a photocopy, facsimile copy, or a photocopy of a facsimile copy of an original hereof or of a counterpart hereof which has been signed by such person. Any photocopy, facsimile copy, or photocopy of facsimile copy of this Agreement or a counterpart hereof shall be admissible into evidence in any proceeding as though the same were an original.

### 11.12 Agreement Supersedes Act.
The provisions of this Agreement shall supersede and control over any and all provisions of the Act to the contrary, to the maximum extent permitted by the Act.

11.13 Option to Purchase Additional Membership Interest. Sula Teller Hogue ("Purchaser") shall have the right, to be exercised any time after the second anniversary of the restaurant opening date as long as she is a Member, to purchase an additional nineteen percent

Page 17 of 19

Case 14-21645   Doc# 29-1   Filed 10/06/14   Page 16 of 19

(19%) ownership interest in Company from David M. Lewis ("Seller") at fair market value with such fair market value determined by an independent appraisal, with costs of said appraisal to be assessed as determined by Supermajority in Interest. Purchaser shall notify Seller of her desire to purchase additional ownership interest(s) by sending him thirty (30) days written notice.

11.14 Life Insurance. Each Member shall purchase a life insurance policy on his or her life in the amount of $150,000.00, such amount to be reviewed annually, and each Member shall name the Company as beneficiary of the policy. Company shall be responsible for reimbursing each Member the cost of such Member's annual premium. Upon such Member's death, the heirs or legal successors of the deceased member shall be paid an amount equal to the product of the deceased member's percentage ownership interest in the Company's assets multiplied by the remainder of the fair market value of those assets after deducting the debt or debts of the company. If the heirs or successors and the remaining members cannot agree on a value for the deceased member's ownership interest, each side shall appoint one appraiser and those two appraisers shall appoint a third appraiser to set the value of the said ownership interest, and the three appraisers shall set the said value. The Company shall then pay the said value over a period not to exceed Thirty-six (36) months in equal monthly payments, together with interest thereon at the prevailing prime rate of interest, as defined by the Wall Street Journal.

11.15 Transfer Restristions. Unless all the Members otherwise agree, if Sula Teller Hogue quits employment of the Company prior to the second anniversary of the restaurant opening date or transfers or attempts to transfer any or all of her ownership interests in said Company by said date, her ownership interests, which are 30% at time of execution of this Operating Agreement, shall have a 0% value and shall be redeemed by the Company for said 0% at which time 901 New Hampshire, LLC and David M. Lewis, personally, agree to indemnify her from her personal guarantees that she has granted to US Bank for the $106,000.00 loan and the lease of 901 New Hampshire, if those two entities fail to release her from her personal guarantees.

11.16 Loan. Sula Teller Hogue and David M. Lewis, as Members of 901 New Hampshire, LLC agree to and approve 901 New Hampshire, LLC entering into a promissory note promising to pay to Milton's Coffee, Inc. the sum of $106,000.00, together with interest at the rate of 5.540% per annum, with principal and interest payable in 59 installments of $1,156.59 each, beginning October 6, 2012, and on the same date for each consecutive month thereafter (except that if a given month does not have such a date, the last day of such month), plus a final payment equal to all unpaid principal and accrued interest on September 6, 2017, the maturity date. Further, in the event of liquidation of Company pursuant to Article IV, payment of this loan shall have equal priority to the payment of Credit Card debt referred to in 8.6.

11.17 Lease. Members agree to the following: (i) 901 New Hampshire, LLC enters into a written lease for restaurant equipment, described on Exhibit A, from Milton's Coffee, Inc. for the term of 5 years for the sum of $600.00 per month with the first lease payment deferred and due May 1, 2013 and due on the same date for each consecutive month thereafter until the final payment is made on April 1, 2018; and (ii) 901 New Hampshire, LLC, at its sole option, may purchase said equipment for a sum certain of $5,000.00 as determined by Supermajority in

Interest. The lease agreement shall include an event of default if 901 New Hampshire, LLC fails to pay Milton's Coffee, Inc. the loan as set forth in 11.16.

11.18 Employees. Members agree that 901 New Hampshire, LLC will lease from Milton's Coffee, Inc. its employees until the end of December 31, 2012, however, the Company has the right to determine which employees Company shall lease subject to the terms of this agreement.

11.19 Reimbursement of expenses to Milton's Coffee, Inc. Members agree that Milton's Coffee, Inc. shall be reimbursed by 901 New Hampshire, LLC for all the expenses and costs that Milton's Coffee, Inc. pays on behalf of 901 New Hampshire, LLC with all expenses and costs subject to approval by SuperMajority in Interest. Further, Members agree that if SuperMajority in Interest determines that it is not prudent to reimburse all or part of said expenses paid by Milton's Coffee, Inc., the members agree that Company shall enter into a loan for said expenses at prevailing prime rate of interest, as published in the Wall Street Journal for such term as the Supermajority in Interest determines and in the event of liquidation of Company pursuant to Article IV, payment of said loan shall have the same priority in payment as the credit card provided by Sula Teller Hogue.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

| **THE COMPANY:** | **THE MEMBERS:** |
|---|---|
| 901 New Hampshire, LLC | |
| By: _____ | _____ |
| David M. Lewis | David M. Lewis |
| As: Member | |
| By: _____ | _____ |
| Sula Teller Hogue | Sula Teller Hogue |
| As: Member | |

## SCHEDULE A
## LIST OF MEMBERS

| Name and Address | Percentage Interest | Initial Capital Contribution |
|---|---|---|
| David M. Lewis<br>912 Rhode Island<br>Lawrence, KS 66044<br>Tax ID# | 70% | $70.00 |
| Sula Teller Hogue<br><br>Address<br>Tax ID# | 30% | $30.00 |

L.L.C. Tax ID#